

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 21, 2020**

_____
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| THE LEVENSON GROUP, INC., et al.[1] | § | Case No. 18-34105 (BJH) |
| | § | |
| Debtors. | § | (Substantively Consolidated) |

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO APPROVE PROCEDURE FOR ASSIGNMENT OF CLAIMS TO TRUSTEE

**I.      Introduction**

The Debtor operated an advertising agency. As a part of the Chapter 7 Trustee's efforts to liquidate the former advertising agency, he believes he is faced with a complex challenge—how does he collect approximately $1.576 million in prepetition accounts receivable that are owed by certain of the Debtor's former clients? At first blush, the analysis seems simple—demand turnover of the amounts owed, which are property of the estate, and sue the former clients if they do not

---

[1] As discussed in more detail below, the court ordered the substantive consolidation of The Levenson Group, Inc. and Levenson & Hill, LLC (collectively, the "Debtor") under case number 18-34105. ECF No. 50.

pay. However, the Trustee asserts that his collection efforts are complicated because the Debtor essentially served as a middleman-agent. Specifically, the Debtor took orders from clients who wanted to place advertisements with media vendors; the Debtor then coordinated with media vendors to purchase the advertisements; the Debtor was subsequently billed by the media vendors; the Debtor thereafter billed the clients, adding an up-charge for the Debtor's commission or fee; the Debtor then collected its accounts receivable from the clients; and finally, the Debtor would pay the media vendors' underlying bill for the advertisements. Unfortunately, this middleman-function broke down when the Debtor fell into financial distress, eventually stopped paying the media vendors and, in fact, started using funds collected from clients for its general operations. Thus, many of the media vendors are now large unsecured creditors of the Debtor and, oftentimes, the client actually paid the Debtor for the underlying services. The Trustee argues that this frequent failure by the Debtor to pay the media vendors—as well as the likely principal/agent relationship between the Debtor and its clients—is stymying his collection efforts. More specifically, at least some of the Debtor's clients have expressed reasonable concern that the unpaid media vendors will likely seek to recover the accounts receivable directly from the clients, based on several theories, including: principal-agent,[2] implied contract, quantum meruit, unjust enrichment, and negligence in monitoring the conduct of an authorized agent. These clients may also assert the

---

[2] *See* Restatement (Third) of Agency § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal,

    (1) the principal and the third party are parties to the contract; and

    (2) the agent is not a party to the contract unless the agent and third party agree otherwise.")

The Trustee states that some of the media vendors performed with the expectation that, under the common law theory of liability described above, the client would be liable, or the Debtor and the client would be jointly and severally liable. Others agreed to (or at least were sent) documents that stated a relationship of sequential liability, meaning that the client would be liable to the media vendor until it paid the Debtor, at which point the Debtor would be solely liable to the media vendor. The Trustee contends that, even in those instances in which a document implies sequential liability, it is not clear whether the document applied to all the ad placements or only a part of them, especially in view of the volume of documents exchanged between the Debtor and the media vendors.

right to offset claims by the Debtor against their liability to the media vendors. Further, at the demand of the media vendors, some clients may have already paid the media vendors directly without the Debtor's knowledge.

Against this backdrop, the Trustee filed his Motion to Approve Procedure for Assignment of Claims to Trustee (the "Motion")[3] that is now before the court. The Chapter 7 Trustee has devised a creative solution to his collection problem. The Trustee proposes that he be allowed to accept voluntary assignments from the media vendors of their direct claims against the clients, which the Trustee can pursue at his discretion. In the event of recovery on these direct claims, the assigning media vendor would receive 65% of the recovery and 35% would go to the bankruptcy estate. Up to approximately 85% of the bankruptcy estate's 35% recovery would be used to pay the Trustee's administrative expenses in pursuing the claim, while the balance (no less than 15% of the bankruptcy estate's 35% recovery) would be distributed pro rata to the Debtor's general unsecured creditors. As an added incentive to entice the media vendors to assign their direct claims, the Trustee would waive any § 547 preference claims the estate has against the assigning media vendor.

The Trustee's goal in wanting to take assignments of these direct claims is purportedly two-fold: (i) to remove impediments to the Trustee's efforts at collecting the bankruptcy estate's accounts receivable; and (ii) to enhance prospects for a dividend to general creditors. One party-in-interest, a former client of the Debtor, Church's Chicken, has objected to the Motion. For the reasons set forth below, the court sustains the objection and denies the Motion.

---

[3] ECF No. 30.

3

## II.    Jurisdiction and Venue

Bankruptcy subject matter jurisdiction exists in this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). The bankruptcy court has authority to adjudicate this matter pursuant to the United States District Court for the Northern District of Texas Miscellaneous Order No. 33. The following shall constitute this court's findings of fact and conclusions of law.

## III.    Findings of Fact

Most of the facts in this matter were undisputed. The Trustee presented the following evidence in support of the Motion: the testimony of Chapter 7 Trustee, James W. Cunningham; the form of assignment the Trustee proposes to use if the Motion is granted; five proposed assignments signed by certain media vendors; and spreadsheets showing proofs of claim filed in the Levenson & Hill, LLC and The Levenson Group, Inc.'s bankruptcy cases, prior to their substantive consolidation.

The Debtor operated a full-service advertising agency that was founded nearly 38 years ago and was based in Dallas, Texas. The Debtor's clients consisted of various businesses seeking to place advertisements on radio, television, print, outdoor, and social media. The Debtor placed orders on behalf of clients with media vendors. It received either a commission, ranging from 6% to 15%, or a monthly fee for its services, depending on the client and the services performed. In some cases, the Debtor would invoice, and the client would pay, a prebilled amount for the estimated media expenditures for a given month. After the month was completed, there would be a reconciliation of the account and a credit or debit adjustment was made to the amount that was prebilled by the Debtor for the services. In the case of clients who were on a commission model,

the commission would be added during the reconciliation process. In the case of some other clients, the Debtor invoiced these clients for services rendered in the prior month.

Upon payment of the reconciled invoice by a client, the Debtor was supposed to pay the media vendors that performed the requested services and retain a commission or fee. Instead, the Debtor sometimes used the client payments to pay the Debtor's corporate expenses, including payroll, rent, taxes, insurance, and similar items. Because the Debtor needed to use funds that were supposed to go to the media vendors to pay operating expenses, the Debtor could not pay the media vendors in full each month. As a result, the balance owed to the media vendors grew over time. A month or so before the Debtor filed for bankruptcy protection, the Debtor basically stopped paying the media vendors altogether.[4]

The Debtor filed for relief under Chapter 7 of the Bankruptcy Code on December 6, 2018. James W. Cunningham was appointed as Chapter 7 Trustee in both cases. Since the petition date, media vendors and other claimants have filed numerous proofs of claim. Due to the two debtors essentially functioning as a single enterprise, the Chapter 7 Trustee moved to substantively consolidate the two cases.[5] The court signed an order approving substantive consolidation of the two debtors on November 25, 2019.[6] Based upon testimony of the Chapter 7 Trustee's accountant, claims aggregate approximately $7.6 million—nearly $7 million of which are media vendor claims.[7]

On the same day the Trustee sought to consolidate the two debtors' cases, he filed the Motion, seeking to resolve the quandary of how to collect approximately $1.576 million in

---

[4] Hr'g Tr. 38:4-5 Nov. 12, 2019.

[5] ECF No. 29.

[6] ECF No. 50.

[7] Trustee's Ex. 7 p. 3.

accounts receivable owed by certain clients. Apparently, more than $1.2 million of this amount (over 75% of the total receivables) is owed by a single client, Dickey's Barbecue Restaurants, Inc. ("Dickey's Barbecue").[8] The Trustee's contention is that, under various theories of liability, including that the Debtor was the agent of the clients, the clients (as principals) remain liable directly to the media vendors, regardless of whether they paid the Debtor for the advertisement placements. His proposed solution is to request authority from this court to enter into assignments with the media vendors so that he himself can pursue their direct claims against the clients. Presumably this will alleviate clients' concerns about duplicative demands or double payment.

If the Trustee successfully obtains a recovery from a client, 65% of the recovery on the assigned claim would be paid to the media vendor and 35% of the recovery would be paid to the estate.[9] Up to approximately 85% of the funds paid to the estate may be used to pay administrative expenses, subject to bankruptcy court approval.[10] The remaining amount would be distributed to prepetition creditors in accordance with Bankruptcy Code priorities.[11] The gross recovery on a client receivable would reduce the media vendor's claim on a dollar for dollar basis.[12] An example may help illustrate how the process would work:

| | |
|---|---|
| Claim of Media Vendor A: | $100,000.00 |
| Hypothetical Recovery from Client B: | $50,000.00 |
| Payment to Media Vendor A (65% of $50,000): | $32,500.00 |
| Payment to Estate (35% of $50,000): | $17,500.00 |
| Funds Available to Pay Administrative Expenses: | Up to $15,000.00 |
| Funds Available for Distribution to Creditors: | Not less than $2,500.00 |
| Media Vendor A's Reduced Claim Against Estate: | $50,000.00 |

---

[8] The Trustee did not provide evidence regarding which clients owe the Debtor's money, only that there were about nine large accounts receivable and that Dickey's Barbecue owed the Debtor quite a lot of money. Hr'g Tr. 24:5-10; 35:6. On November 21, 2019, when the court questioned the Trustee's counsel on this point in his closing argument, he stated that Dickey's Barbecue owed at least $1.2 million of the total amount.

[9] Trustee's Ex. 2. ¶ 5.

[10] *Id.*

[11] *Id.*

[12] *Id.*

6

In addition to any potential recovery, the Trustee has agreed to waive any potential § 547 preference action against the assigning media vendor.[13]

Cajun Operating Company d/b/a Church's Chicken ("Church's Chicken") was the Debtor's client for three decades. The parties' respective rights and obligations were governed by a Master Agency Agreement. Church's Chicken terminated that agreement, effective October 23, 2018, and allegedly remitted all amounts it owed to the Debtor. In November 2018, when Church's Chicken became aware that the Debtor was not paying media vendors for services provided to Church's Chicken, it initiated a lawsuit against the Debtor in federal court. That lawsuit was stayed when the Debtor sought bankruptcy protection.

On November 6, 2019, Church's Chicken filed its objection (the "Objection")[14] to the Motion.[15] In its Objection, Church's Chicken makes several arguments regarding why the Motion should be denied, including: (a) that the Trustee is failing to exercise proper business judgment in proposing to waive preference actions against media vendors who assign their claims; and (b) that the Trustee would not have standing to bring the assigned media vendor claims if the court approves the proposed assignment procedures.

The court holds that the Motion should be denied because there is insufficient evidence to conclude that the proposed assignment procedures are: (i) fair and equitable; (ii) in the best interest of the estate; and (iii) reflective of reasonable business judgment on the part of the Trustee. Moreover, under the proposed assignment arrangement, the assigning creditors would retain such a large proportion of the ultimate recovery on the assigned claims that the proposed assignments

---

[13] *Id*. at ¶ 6.

[14] ECF No. 30.

[15] On the eve of the hearing, Dickey's Barbecue filed a one sentence joinder to Church's Chicken's objection in the Levenson & Hill, LLC case. Case No. 18-34107; ECF No. 86.

would also not appear to be outright, unconditional assignments. Rather, the media vendors would be retaining the bulk of any recoveries such that they would simply be "assigning" their claims for the purpose of allowing the Trustee to bring suit—essentially like a collection agent. Thus, the court envisions "standing" arguments being asserted against the Trustee in future litigation against the clients (*i.e.,* arguments that the assignor media vendors were the true parties in interest)—which standing arguments may have a substantial chance of success.

## IV. Legal Analysis

### A. *Caplin v. Marine Midland* [16] *is Not a Prohibition on Assignment of Claims to a Trustee.*

First, at a very basic level, property of a bankruptcy estate may include property acquired *post*petition. The bankruptcy estate is comprised of several types of property, including property interests that the estate acquires *post*petition.[17] Notwithstanding this truism, Church's Chicken argues that the Supreme Court's *Caplin* case precludes the proposed assignments in the case at bar.

The Supreme Court explained in the *Caplin* case that a trustee generally does not have the power to assert, on behalf of the bankruptcy estate, a claim that a creditor has directly against a third party.[18] The trustee's role is limited to pursuing the legal and equitable interests ***of the debtor***—that is, the estate's own causes of action.[19] But what if a creditor chooses to ***assign*** to the trustee a claim it has against a third party? Is this generally permissible? The concept of an assignment is not addressed or prohibited by *Caplin*.[20] The court believes that the concept of a

---

[16] *Caplin v. Marine Midland Grace Trust Co.*, 406 US 416 (1972).

[17] 11 U.S.C. § 541(a)(7).

[18] 406 US 416, 434 (1972).

[19] *In re Ozark Rest. Equip. Co., Inc.*, 816 F.2d 1222, 1229 (8th Cir. 1987) (emphasis added).

[20] *In re Bogdan*, 414 F.3d 507, 511 (4th Cir. 2005).

creditor assigning to a trustee its claims against a non-debtor third party (*i.e.,* a property right) is not *per se* impermissible. Rather, one starts by looking to state law.

      B.   *Applicable State Law.*

As explained by the Supreme Court more than 40 years ago in *Butner v. U.S.*, "[p]roperty interests are created and defined by state law. Thus, unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."[21] In this case, we look to Texas state law to determine whether a media vendor's assignment of its property interest—*i.e.,* its claim—to the Trustee is proper. In Texas, claims that are property-based and remedial in nature are generally assignable, while claims that are personal and punitive are not.[22] Examples of claims that fit in the latter category are DTPA violations, legal malpractice, defamation, slander, battery, and false imprisonment.[23]

Here, the Trustee is seeking to accept assignments of the media vendors' potential quasi-contract/tort claims against the clients. These claims do not arise from any direct contract between the clients and the media vendors, but rather, due to the Debtor's failure to pay the media vendors. On balance, the court concludes that these claims probably fit more within the "property-based and remedial" category, which the Texas Supreme Court has determined are generally assignable.[24] Accordingly, the court holds that the claims are assignable under Texas state law and are capable of being assigned to the Trustee.

---

[21] 440 U.S. 48, 55 (1979).

[22] *PPG Industries, Inc. v. JMB/Houston Centers Partners Ltd. Partnership,* 146 S.W.3d 79, 87 (Tex. 2004). *See also, Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W3d 145, 154 (Tex. App.—Austin 2017, pet. denied) ("a contractual right can be assigned unless . . . the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy.").

[23] *See PPG Industries*, 146 S.W.3d at 87, 89, n. 34.

[24] *Id.*

In the Trustee's Reply[25] to the Objection and at oral argument, he suggested that the court should end its inquiry here. According to the Trustee, this is simply a matter of whether, under applicable non-bankruptcy law, the media vendors have a property right/claim that can be assigned to the Trustee. The court disagrees. Just because an assignment is possible doesn't mean it should be approved.

   C.  *What Legal Standard Should Be Applied by the Bankruptcy Court?*

But what standard applies in assessing whether approval of the assignment arrangements is appropriate? It would seem that the assignment arrangements proposed in the case at bar are somewhat in the nature of a compromise and settlement. Therefore, the court would need to consider whether the arrangement is fair and equitable and in the best interests of the estate.[26] However, the proposed assignment arrangements are also somewhat in the nature of a § 363 use of property, since there is some bartering of consideration at play (*i.e.,* divvying up of future recoveries), meaning that the court would consider whether the trustee is exercising reasonable business judgment in proposing the overall transaction.[27]

---

[25] ECF No. 38.

[26] *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (In evaluating whether a settlement is fair and equitable the court considers (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise.); *Con. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (A bankruptcy court may approve a compromise if it is "fair and equitable and in the best interest of the estate.); *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); (Courts consider whether a settlement is in "the best interests of the creditors, with proper deference to their reasonable views . . . [and] the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.") (internal citations and quotations omitted).

[27] *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir.1986); ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business

The court cannot approve the proposed assignment arrangements in the case at bar under either standard set forth above. First, the court has not been presented with sufficient evidence to conclude that the proposed assignments are fair and equitable and in the best interest of the estate. On a situation-by-situation basis, certain assignments might be reasonable with certain media vendor's claims. In fact, this court approved a compromise and settlement among the Trustee, certain media vendors, and one client, Southwest Restaurant Management Group, Inc. ("Southwest"), whereby 65% of the recovery went to the estate, with the remaining 35% going to media vendors who had provided advertising services to Southwest.[28] However, blanket approval of the overall assignment concept seems insupportable.

Additionally, the court cannot, based on the sparse evidence, find that the proposed assignment arrangements would be reflective of reasonable business judgment. Specifically, under the proposed arrangements, the assigning-creditors would retain such a large proportion of the ultimate recovery on the "assigned" claims that the proposed assignments would not appear to be outright, unconditional assignments. The assignor-creditors (*i.e.*, media-vendors) would be retaining so much of any recoveries that it would appear that they would only be "assigning" their claims for the purpose of allowing the trustee to bring suit—essentially like a collection agent. As the Trustee testified, the payment structure is designed to mimic a contingency fee that the media vendors would have to pay an attorney if they chose to pursue the claims themselves.[29] Thus, the court envisions "standing" arguments being asserted in future litigation by the trustee against the

---

justification for using, selling, or leasing the property outside the ordinary course of business."); *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (The use of property of the estate under § 363(b) incorporates a business judgment standard.); *Matter of VCR I, L.L.C.*, 922 F.3d 323, 326 (5th Cir. 2019) ("A sale under § 363 'requires notice and a hearing and is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons.'") (quoting *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010)).

[28] ECF No. 32.

[29] Hr'g Tr. 34:7-15.

11

clients (*i.e.,* arguments that the assignors were, in fact, the true parties-in-interest)—which standing arguments might have a substantial chance for success. There is certain persuasive case law that suggests that an assignment is not a true assignment if the assignor will still be recovering the primary benefits of an assigned claim.[30]

    D.  *Does This Have to be So Complicated?*

In closing, the court notes that the Trustee's allegedly complex challenge to collecting the Debtor's accounts receivable does not seem so complex. What is complex is the Trustee's proposed solution to what is essentially a two-party dispute between the Debtor and its largest client/account debtor, Dickey's Barbecue. The evidence was not persuasive that the assignment procedures would reduce litigation and, in fact, the court believes it is more likely to increase and complicate any litigation.[31] While creative solutions are occasionally needed to resolve issues in a bankruptcy case, the solution proposed by the Trustee does not seem appropriate here.

Based on the foregoing,

    **IT IS ORDERED** that the Motion is **DENIED**.

        **###END OF MEMORANDUM OPINION AND ORDER###**

---

[30] *See Williams v. California 1st Bank (In re Estate of Chacklan Enters., Inc.)*, 859 F.2d 664, 666 (9th Cir. 1988) (holding that a trustee lacked standing to pursue assigned claims where assigning creditors would receive the bulk of the recovery and, therefore, were the real parties in interest). Courts typically find that a trustee has standing to pursue an assigned claim where the proceeds are distributed pro rata (*Bogdan*, 414 F.3d at 513; *In re AgriBioTech*, 319 B.R. 207, 211 (D. Nev. 2004); *In re Delta Investments & Development, LLC*, 2019 WL 137578 at *16 (Bankr. S.D. Miss, January 8, 2019)) or where the trustee is seeking to recover primarily for the benefit of the debtor's estate (*In re Barnett*, 2015 WL 9581384 at *15 (Bankr. S.D.N.Y Dec. 29, 2015); *Finova Capital Corp. v. Lawrence*, 2000 WL 1808276 at *2 (N.D. Tex. Dec. 8, 2000)).

[31] *See Caplin*, 406 US at 431-32.